IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **ROBERT E. SAMPSON,**<br>Plaintiff<br><br>v.<br><br>**JACK LEE, et al.,**<br>Defendants. | Civil Action No.: 7:12cv00244<br><br><br><u>**REPORT AND RECOMMENDATION**</u><br>By: PAMELA MEADE SARGENT<br>United States Magistrate Judge |

The pro se plaintiff, Robert E. Sampson, is a Virginia Department of Corrections, ("VDOC"), inmate formerly housed at Middle River Regional Jail, ("Middle River"). This case is before the court on the Motion To Dismiss filed on behalf of defendants, S.E. Young and the Medical Department of Middle River, (Docket Item No. 55), ("Motion to Dismiss"), and Motion For Summary Judgment, (Docket Item No. 57), filed on behalf of defendants, Superintendent Jack Lee, Major Lori Nicholson, Cathy Riley, R.N., S.E. Young, Cpl. Jack Hinton, Dr. Moises Quiñones, M.D., Middle River and the Medical Department of Middle River, ("Motion for Summary Judgment"). The plaintiff has responded to the motions. None of the parties have requested a hearing. The motions are before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report and recommended disposition.

*I. Facts*

Sampson brings this civil rights action under 42 U.S.C. § 1983 against Middle River, its Medical Department, various VDOC officers and various medical personnel, alleging claims arising from a trip and fall in the recreation

yard injuring his ankle, the subsequent medical treatment received for his ankle injury and a 14-day period during which he was removed from a no-pork special diet. Sampson's allegations are contained in his Complaint and Motion to Amend. (Docket Item Nos. 1, 12.)

Sampson claims that, on April 20, 2012, he suffered injuries to his ankle, when he tripped and fell in the recreation yard at Middle River. Sampson claims that he tripped on screws that had loosened from a storm drain plate located in the recreation yard. Sampson alleges that his right to be free from cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution was violated by his injury and how his injury was medically neglected. Sampson also alleges that his First Amendment right to freely exercise his religion was violated by denying his request for a no-pork special diet. Sampson claims that he was denied a no-pork diet from May 22, 2012, through June 5, 2012, which resulted in cruel and unusual punishment.

Sampson's Complaint and Motion to Amend contain no allegations regarding his faith or the religious tenets to which he adheres other than one Inmate Request Form on which he states he is a Christian.

Major Lori Nicholson has filed an affidavit in support of the Motion for Summary Judgment, ("Nicholson Affidavit"). (Docket Item No. 58, Exhibit B.) Nicholson stated that she first learned of Sampson's complaint regarding his ankle injury several days after it occurred, through Sampson's use of the grievance procedure. (Nicholson Affidavit at 1.) Nicholson stated that prior to April 20, 2012, she was unaware that there was a defect with the screws on any storm drain plate in the recreation yard. (Nicholson Affidavit at 1.) When she became aware of

-2-

Case 7:12-cv-00244-SGW-PMS   Document 68   Filed 12/19/12   Page 2 of 20   Pageid#: 265

Sampson's complaint, several days after the incident allegedly occurred, she went to the recreation yard to inspect the storm drain plates herself. (Nicholson at 1.) At that time, Nicholson stated that she did not see any defect with the screws. (Nicholson Affidavit at 1.) Nicholson later learned that Officer Rexrode, from maintenance, already had been to the recreation yard to fix the condition about which Sampson complained. (Nicholson Affidavit at 2.) Consequently, at the time she inspected it, the condition had been repaired. (Nicholson Affidavit at 2.)

Nicholson stated that a couple of weeks later, it was reported to her that the screws in the storm drain plates had come loose again. (Nicholson Affidavit at 2.) She again went to the recreation yard to check this condition; however, this was well after Sampson's fall on April 20, 2012. (Nicholson Affidavit at 2.) At this time, Nicholson could not determine whether an inmate had tampered with the screws, whether there was an actual defect in the manufacture of the screws or some other cause. (Nicholson Affidavit at 2.) According to Nicholson, loosened screws could present a significant security risk if an inmate were to successfully pull off one of the storm drain plates and use it as a weapon against other inmates or officers. (Nicholson Affidavit at 2.) The decision was made to replace all of the screws in storm drain plates in the recreation yard with new screws. (Nicholson Affidavit at 2.)

Superintendent Jack Lee also filed an affidavit in support of the Motion for Summary Judgment. ("Lee Affidavit"). (Docket Item No. 58, Exhibit A.) Lee stated that prior to Sampson's injury, he was not aware of the existence of any loose screws in the storm drain plates in the recreation yard. (Lee Affidavit at 1.) Lee subsequently learned that Major Nicholson investigated the matter, and subsequent remedial measures were taken to correct the condition. (Lee Affidavit

at 1.) He stated that he had no firsthand knowledge or direct involvement with this issue. (Lee Affidavit at 1.)

Sampson also complains that he was denied a no-pork diet from May 22, 2012, through June 5, 2012. When Sampson was booked into Middle River on March 1, 2012, he requested a no-pork diet for religious reasons. (Nicholson Affidavit at 3.) Sampson did not identify any specifics. (Nicholson Affidavit at 3.) Based upon his request, Sampson was placed on a no-pork diet. (Nicholson Affidavit at 3.)

Corporal Jack Hinton filed an affidavit in support of the Motion for Summary Judgment. ("Hinton Affidavit"). (Docket Item No. 58, Exhibit C.) On May 22, 2012, Hinton observed Sampson take a regular tray of food and eat from it. (Hinton Affidavit at 1.) After Sampson ate the first tray of food, he requested a second tray, claiming that the first tray of food was a regular tray, and he was supposed to receive a no-pork tray. (Hinton Affidavit at 1.) Hinton said he did not give Sampson a second tray because he already had eaten the first tray of food, and to give Sampson two trays would violate Middle River policy. (Hinton Affidavit at 1.) Hinton reported the incident to his supervisor. (Hinton Affidavit at 1.) The situation came to the attention of Nicholson. (Nicholson Affidavit at 3.)

Nicholson stated that it is Middle River's practice that, if an inmate who has been approved to receive a special diet eats from a regular tray, he is removed from the list to receive the special diet. (Nicholson Affidavit at 3.) The purpose of this practice is to control and manage resources. (Nicholson Affidavit at 3.) The preparation of special meal trays imposes an administrative and financial burden on the jail. (Nicholson Affidavit at 3.) Inmates who are put on a special diet list for

-4-

Case 7:12-cv-00244-SGW-PMS   Document 68   Filed 12/19/12   Page 4 of 20   Pageid#: 267

religious or other reasons are expected to eat from that specifically made tray. (Nicholson Affidavit at 3.) If they are permitted to periodically or regularly reject their specifically made tray in favor of the regular tray, the specifically made tray is wasted, and there may not be enough regular trays to serve to the other inmates. (Nicholson Affidavit at 3.) Likewise, if an inmate is permitted to take two trays, there may not be enough food for the other inmates or food services will have to overestimate the number of trays, thus, increasing their work and budget substantially. (Nicholson Affidavit at 3.) Allowing inmates to violate Middle River practice in this fashion would create a substantial administrative and financial burden to the jail. (Nicholson Affidavit at 4.)

In this case, Sampson ate from the tray given to him, and attempted to get a second tray. (Nicholson Affidavit at 4.) Consequently, Sampson was removed from the no-pork list. (Nicholson Affidavit at 4.) While the decision was based upon Hinton's report, he did not make the decision to remove Sampson from the no-pork list. (Hinton Affidavit at 1.) Sampson grieved this decision asserting unidentified religious reasons and medical reasons. (Nicholson Affidavit at 4.) Nicholson reviewed Sampson's grievances, spoke with Hinton, and she spoke with Sampson. (Nicholson Affidavit at 4.) Nicholson noted that there was no medical order in Sampson's file for a no-pork diet. (Nicholson Affidavit at 4.) Sampson reported to her that he took the regular tray in error and began eating from it before he realized it was the wrong tray. (Nicholson Affidavit at 4.) Sampson reported to her that when he attempted to get the correct tray, his request for a second tray was denied because he already had eaten the regular diet tray. (Nicholson Affidavit at 4.) Giving Sampson the benefit of the doubt, Nicholson determined that there could have been a misunderstanding between Sampson and the reporting officer. (Nicholson Affidavit at 4.) Nicholson approved Sampson to start receiving the no-

pork diet tray again on June 5, 2012. (Nicholson Affidavit at 4.) Lee became aware of the situation after the fact. (Lee Affidavit at 2.) He learned that Nicholson reinstated Sampson's "no pork" status on June 5, 2012, after a thorough investigation into the matter. (Lee Affidavit at 2.)

Dr. Moises E. Quiñones, M.D.,[1] and registered nurse Cathy Riley, both filed affidavits in support of the Motion for Summary Judgment. ("Quiñones Affidavit" and "Riley Affidavit"). (Docket Item No. 58, Exhibit E; Docket Item No. 60, Att. 1.) Dr. Quiñones and Riley stated that on April 20, 2012, Sampson reported to the medical department that he had injured his right ankle. (Quiñones Affidavit at 1; Riley Affidavit at 1.) Sampson reported to EMT Blackburn that he had twisted his ankle while playing basketball. (Quiñones Affidavit at 1; Riley Affidavit at 1.) EMT Blackburn assessed his condition and applied the nursing guidelines as prescribed by Dr. Quiñones. (Quiñones Affidavit at 1; Riley Affidavit at 1.) This included ibuprofen, ice and ACE wrap. He was taken off of work and was advised to report if signs and symptoms increased. (Quiñones Affidavit at 1; Riley Affidavit at 1.) Sampson was advised to elevate his ankle when not walking. (Quiñones Affidavit at 1; Riley Affidavit at 1.)

Dr. Quiñones examined Sampson on April 26, 2012, and Sampson reported twisting his ankle playing basketball. (Quiñones Affidavit at 2; Riley Affidavit at 2.) At that time, he reported injury to both his right ankle and right hand. (Quiñones Affidavit at 2; Riley Affidavit at 2.) Dr. Quiñones noted no visible injury, but there was a decreased range of motion, secondary to pain and swelling.

---

[1] Dr. Quiñones's affidavit attached to the defendants' motion for summary judgment is signed, but not notarized. A signed and notarized copy of Dr. Quiñones's affidavit has been filed separately with the court. (Docket Item No. 60, Att. 1.)

(Quiñones Affidavit at 2; Riley Affidavit at 2.) He ordered an x-ray of both Sampson's right hand and right ankle. (Quiñones Affidavit at 2; Riley Affidavit at 2.) He ordered ACE wrap and elevation. (Quiñones Affidavit at 2; Riley Affidavit at 2.) Dr. Quiñones ordered Sampson to be kept in the infirmary, as a precautionary measure, until his x-rays came back. (Quiñones Affidavit at 2; Riley Affidavit at 2.) Dr. Quiñones reassured Sampson again of his findings, specifically, that he did not have a serious injury. (Quiñones Affidavit at 2.) Dr. Quiñones's diagnosis was sprained ankle and hand contusion. (Quiñones Affidavit at 2.)

Sampson had an x-ray performed, as ordered, on April 30, 2012. (Quiñones Affidavit at 2; Riley Affidavit at 2.) The x-ray report noted no fracture or dislocation in his hand or ankle. (Quiñones Affidavit at 2; Riley Affidavit at 2.) Significant soft tissue swelling suggesting injury in the ankle was noted. (Quiñones Affidavit at 2; Riley Affidavit at 2.)

On May 1, 2012, Sampson requested to go back to general population. (Riley Affidavit at 2.) His ankle appeared swollen, and Nurse Smith advised him to keep it elevated. (Riley Affidavit at 2.) On May 2, 2012, Riley met with Sampson and gave him the x-ray report. (Quiñones Affidavit at 2; Riley Affidavit at 2.) Riley explained to him the importance of healing time, rest and elevation for soft tissue injuries. (Quiñones Affidavit at 2; Riley Affidavit at 2.) Sampson verbalized his understanding. (Quiñones Affidavit at 2; Riley Affidavit at 2.) Sampson was given permission to have two pillows to elevate his hand and ankle. (Quiñones Affidavit at 2; Riley Affidavit at 2.) Sampson was cleared to be returned to general population. (Quiñones Affidavit at 2; Riley Affidavit at 2.)

On May 15, 2012, Dr. Quiñones reevaluated Sampson. (Quiñones Affidavit at 2; Riley Affidavit at 2.) Sampson voiced his concern that he believed he had a hairline fracture and that he wanted to view his x-rays. (Quiñones Affidavit at 2; Riley Affidavit at 2.) He threatened legal action if his demands were not met. (Quiñones Affidavit at 2; Riley Affidavit at 2.) Dr. Quiñones reexamined Sampson's ankle and hand and explained to him the x-ray report. (Quiñones Affidavit at 2-3; Riley Affidavit at 2.) Because the x-ray films were sent out to be read, they were not available for Sampson to see. (Quiñones Affidavit at 3.) Dr. Quiñones's assessment included sprained ankle consistent with an anterior talofibular ligament injury. (Quiñones Affidavit at 3; Riley Affidavit at 2.) Sampson's hand was well-healed. (Quiñones Affidavit at 3; Riley Affidavit at 2-3.) Sampson was reassured at great length and given an option to be admitted to the infirmary, which he refused. (Quiñones Affidavit at 3; Riley Affidavit at 3.) He was prescribed ibuprofen for pain, as needed, continued elevation, minimal weight bearing and compression with ACE wrap. (Quiñones Affidavit at 3; Riley Affidavit at 3.) Dr. Quiñones did note that in view of Sampson's continued concern over his injuries, that he would be allowed to arrange for a third opinion with an orthopedist of his choice, at his own expense, and the jail's control over the scheduled visit, for security purposes. (Quiñones Affidavit at 3; Riley Affidavit at 3.) Dr. Quiñones did not prescribe crutches, secondary to security concerns, and he placed Sampson on sports/work restriction. (Quiñones Affidavit at 3; Riley Affidavit at 3.) Sampson was to return to the medical department as needed, especially if his symptoms increased. (Quiñones Affidavit at 3; Riley Affidavit at 3.)

On May 24, 2012, Sampson requested to be released to go to the recreation yard. (Riley Affidavit at 3.) Dr. Quiñones saw Sampson on May 31, 2012, at which

-8-

Case 7:12-cv-00244-SGW-PMS   Document 68   Filed 12/19/12   Page 8 of 20   Pageid#: 271

time Sampson was requesting ibuprofen for chronic ankle pain and hand pain. (Quiñones Affidavit at 3; Riley Affidavit at 3.) Dr. Quiñones noted decreased swelling in Sampson's ankle and no swelling in his right hand. (Quiñones Affidavit at 3; Riley Affidavit at 3.) Dr. Quiñones again noted there was no visible sign of serious injury. (Quiñones Affidavit at 3; Riley Affidavit at 3.) He prescribed ibuprofen as needed for pain. (Quiñones Affidavit at 3; Riley Affidavit at 3.)

On June 26, 2012, Dr. Quiñones examined Sampson for ear and throat problems. (Quiñones Affidavit at 3; Riley Affidavit at 3.) At that time, he also took Sampson off recreational restriction at Sampson's request. (Quiñones Affidavit at 3; Riley Affidavit at 3.) Sampson reported to him on that day that his ankle and hand were alright and that he felt fine. (Quiñones Affidavit at 3; Riley Affidavit at 3.) Sampson reported that his legal issue was about not getting the proper care that he wanted. (Quiñones Affidavit at 3; Riley Affidavit at 3.) Sampson reassured Dr. Quiñones that he just wanted to go outside, not to participate in sports. (Quiñones Affidavit at 3; Riley Affidavit at 3.) Dr. Quiñones noted that Sampson seemed responsible and cogent regarding his present status and condition. (Quiñones Affidavit at 3; Riley Affidavit at 3.)

Dr. Quiñones stated that in his best medical judgment, Sampson did not need a third opinion or treatment by an outside specialist. (Quiñones Affidavit at 4.) His soft tissue injury would be best treated with analgesics such as ibuprofen, elevation, minimal weight bearing and compression. (Quiñones Affidavit at 4.) Dr. Quiñones offered Sampson the opportunity to arrange for an outside orthopedic evaluation of his choice. (Quiñones Affidavit at 4.) Dr. Quiñones evaluated and examined Sampson four times over a two-month period and addressed each one of Sampson's complaints including, but not limited to, his frustration regarding his

care. (Quiñones Affidavit at 4.) According to Dr. Quiñones, he ordered the appropriate studies, treatment and reassured Sampson in a professional and compassionate manner. (Quiñones Affidavit at 4.)

Since there was no medically determinable need for the outside opinion or treatment per Dr. Quiñones, Riley could not schedule that outside appointment at the jail's expense. (Riley Affidavit at 4.) Riley gave Sampson the option of getting a third opinion at his own expense at which time she offered to arrange for the x-ray films to be sent to his doctor. (Riley Affidavit at 4.) Dr. Quiñones made the decision whether Sampson could or could not participate in recreation activities. (Riley Affidavit at 4.) Riley did not have the authority to countermand Dr. Quiñones's orders. (Riley Affidavit at 4.)

Lee and Nicholson do not have any specialized medical training and do not hold medical licenses. (Lee Affidavit at 2; Nicholson Affidavit at 2.) Nicholson reviewed Sampson's medical grievances, reviewed his medical chart and spoke with Riley. (Nicholson Affidavit at 2.) Lee and Nicholson relied upon the professional judgment of Dr. Quiñones and Riley with respect to the treatment of Sampson's ankle condition. (Lee Affidavit at 2; Nicholson Affidavit at 3.)

*II. Analysis*

I will first address the Motion to Dismiss. The defendants Young and the Medical Department have moved for dismissal of Sampson's claims against them for failing to state a claim upon which relief may be granted. In considering a motion to dismiss, all well-pleaded factual allegations contained in a complaint are to be taken as true and viewed in the light most favorable to the plaintiff. *See*

*Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Nevertheless, the complaint must contain "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action," and must allege facts specific enough to raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).

The Eighth Amendment of the United States Constitution prohibits the infliction of cruel and unusual punishment on convicted prisoners. *See* U.S. CONST. amend. VIII. To demonstrate cruel and unusual punishment, a plaintiff must establish that the defendants acted with "deliberate indifference" and he experienced an extreme deprivation of a basic human need or "serious or significant" pain or injury. *Wilson v. Seiter*, 501 U.S. 294, 299-303 (1991). In order to state a claim for violation of the Eighth Amendment right to be free from cruel and unusual punishment based on medical care, an inmate must show deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Mere negligence in rendering medical care to a prisoner, however, does not rise to the level of a claim cognizable under § 1983. *See Goode v. Hartman*, 388 F. Supp. 541, 542 (E.D. Va. 1975); *Bishop v. Cox*, 320 F. Supp. 1031, 1032 (W.D. Va. 1970). "'Allegations of improper or insufficient medical treatment do not state a Constitutional claim.'" *Bishop*, 320 F. Supp. at 1032 (quoting *Hopkins v. County of Cook*, 305 F. Supp. 1011, 1012 (N.D. Ill. 1969)). In order to establish a constitutional deprivation cognizable pursuant to § 1983, the treatment complained of must suggest "conduct that shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952).

To amount to deliberate indifference, a public official must have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Furthermore, to bring a medical treatment claim against nonmedical personnel, an inmate must show that such officers were personally involved in a denial of treatment, deliberately interfered with prison doctors' treatment or tacitly authorized or were indifferent to the prison physicians' misconduct. *See Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990) (overruled on other grounds).

Courts also have held that although inmates lose some constitutional protections upon incarceration, they retain the right to freely worship while in prison. *See McManus v. Bass*, 2006 WL 753017, at *4 (E.D. Va. Mar. 22, 2006) (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)). The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. …" U.S. CONST. amend. 1. The Free Exercise Clause extends to prison inmates. *See O'Lone*, 482 U.S. at 348; *Morrison v. Garraghty*, 239 F.3d 648, 656 (4th Cir. 2001). However, an inmate's constitutional rights must be evaluated within the context of his incarceration. The Supreme Court has long cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison administration[,]" *Procunier v. Martinez*, 416 U.S. 396, 405 (1974) (dictum), and, thus, the court "must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration[,] *Lovelace v. Lee*, 472 F.3d 174, 199 (4th Cir. 2006). This deference is achieved by a rational basis test. The court considers four factors to determine if prison regulations are reasonably

related to legitimate penological interests: (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether the interest is "so remote as to render the policy arbitrary or irrational;" (2) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (3) what impact accommodation of the asserted right will have on security prison staff, on inmates' liberty and on the allocation of limited prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns." *Lovelace*, 472 F.3d at 200 (quoting *Turner v. Safley*, 482 U.S. 78, 89-92 (1987)).

When applying these factors, the court must "respect the determinations of prison officials." *United States v. Stotts*, 925 F.2d 83, 86 (4th Cir. 1991). The burden of proof under the *Turner* analysis is on the prisoner to disprove the validity of the prison regulation at issue. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

In order to establish a right under the Free Exercise Clause, Sampson must make two threshold showings before turning to the rational basis test. First, Sampson must show that he sincerely holds his religious beliefs. *See Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972). Second, Sampson must show that his claims are rooted in religious belief and are not "purely secular." *Yoder*, 406 U.S. at 215-16. If Sampson can make these two threshold showings, he then must show that the free exercise of his religion is substantially burdened by the government policy or action at issue. *See Sherbert v. Verner*, 374 U.S. 398 (1963).

Although Sampson has named Young as a defendant, Sampson has alleged no facts from which the court could find that Young was personally aware of a substantial risk of serious harm or that Young actually recognized the existence of such a risk. Sampson also has alleged no facts from which the court could find that Young was involved in the decision to deny Sampson a no-pork diet. In his Memorandum of Law, (Docket Item No. 65), Sampson alleges that Young placed him in segregation, but those claims are not contained in his Complaint or Motion to Amend. Therefore, I find that Sampson has failed to state a claim upon which relief may be granted against Young, and I will recommend that Young's Motion to Dismiss be granted.

Sampson also names the Medical Department of Middle River as a defendant in this case. The Medical Department of Middle River is not a recognized entity subject to suit. Rather, it is merely a department within Middle River. *See* VA. CODE ANN. § 53.1-95.2 *et. seq.* (regarding creation and operation of regional jail authorities). Therefore, any claims against the Medical Department must be dismissed. *See Atkins v. Med. Dep't of Middle River Reg'l Jail,* 2007 U.S. Dist. LEXIS 49693 (W.D. Va. July 10, 2007) (dismissing the Medical Department of the Middle River Regional Jail as it is not a recognized entity subject to suit).

I now turn to the Motion for Summary Judgment. With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, *Ky.,* 93 F.3d 230, 233 (6th Cir. 1996).

The defendants argue that summary judgment should be entered in their favor on Sampson's claims based on his injury to his ankle. Sampson appears to argue that the defendants are liable for his injuries based on their negligence. Even if allegations of negligence could rise to a constitutional level, the undisputed evidence in this case does not establish negligence.

By sworn affidavit, Nicholson stated that prior to April 20, 2012, she was unaware that there was a defect with the screws on any storm drain plate in the recreation yard. (Nicholson Affidavit at 1.) She stated that when she became aware of Sampson's complaint, she went to the recreation yard to inspect the storm drain plates and did not see any defect with the screws. (Nicholson Affidavit at 1.) Nicholson later learned that maintenance had fixed the condition. (Nicholson Affidavit at 2.) Therefore, at the time Nicholson inspected the drain plates, the condition already had been repaired. (Nicholson Affidavit at 2.) On May 23, 2012,

-15-

in a response to Sampson's grievance, Nicholson stated that the recreation yard had been closed until the issue had been corrected. (Attachment to Verified Statement, (Docket Item No. 2), at page 8.) Nicholson stated in her affidavit that the decision was made to replace all of the screws in the storm drain plates in the recreation yard with new screws. (Nicholson Affidavit at 2.)

Lee stated that he was not aware of the existence of any loose screws in the recreation yard prior to Sampson's injury. (Lee Affidavit at 1.) Lee subsequently learned that Nicholson investigated the matter, and subsequent remedial measures were taken to correct the condition. (Lee Affidavit at 1.) Lee stated that he had no firsthand knowledge or direct involvement with this issue. (Lee Affidavit at 1.)

Thus, the evidence shows that the alleged trip hazard was unknown to the defendants prior to the injury claimed by Sampson. While Sampson argues that the defendants delayed in remedying the condition, he does not allege another injury arising out of the alleged condition. In fact, Sampson was on medical restriction from the recreation yard until June 26, 2012. (Quiñones Affidavit at 3; Riley Affidavit at 3.) Therefore, I will recommend the court grant the motion and enter summary judgment in the defendants' favor on this claim.

Sampson also asserts that the defendants were deliberately indifferent to his serious medical need regarding treatment of an ankle injury, which constituted the infliction of cruel and unusual punishment on him.

As stated above, in order to establish a constitutional deprivation cognizable pursuant to § 1983, the treatment complained of must suggest "conduct that shocks the conscience." *Rochin*, 342 U.S. at 172. To amount to deliberate indifference, a

public official must have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk. *See Farmer*, 511 U.S. at 837.

Sampson has failed to present evidence demonstrating that he had a serious medical need for an outside orthopedic evaluation or that Dr. Quiñones or Riley were deliberately indifferent to that need. Dr. Quiñones evaluated and examined Sampson four times over a two-month period and addressed each one of Sampson's complaints. He ordered the appropriate studies and treatments, and he reassured Sampson. (Quiñones Affidavit at 4.) Dr. Quiñones believed in his best medical judgment that Sampson's soft tissue injury would be best treated with analgesics such as ibuprofen, elevation, minimal weight bearing and compression. (Quiñones Affidavit at 4.) Dr. Quiñones offered Sampson the opportunity to arrange for an outside orthopedic evaluation of his choice at Sampson's own expense. Dr. Quiñones's decision to restrict Sampson's recreation time was in furtherance of his treatment of his ankle condition. Nurse Riley does not have the authority to countermand Dr. Quiñones's orders. (Riley Affidavit at 4.) The evidence demonstrates that Nurse Riley responded to Sampson's concerns and communicated to him Dr. Quiñones's orders and offered to schedule him with the outside appointment at his own expense if he wanted to do so. Furthermore, Lee and Nicholson do not have any specialized medical training. Lee and Nicholson relied upon the professional judgment of Dr. Quiñones and Riley with respect to the treatment of Sampson's ankle condition. Sampson has presented no evidence that his condition was not treated appropriately, that he had a serious need for different treatment or that the defendants acted with deliberate indifference. Therefore, I recommend the court grant the motion and enter summary judgment in the defendants' favor on Sampson's claims related to his medical treatment.

Sampson also asserts a First Amendment violation against Middle River, Lee, Nicholson and Hinton in that he was denied a no-pork diet from May 22, 2012, through June 5, 2012. Sampson asserted medical reasons and unidentified religious reasons for his need for a no-pork diet. Sampson has not described his religious need for a no-pork diet nor has he presented any evidence regarding how his removal from the no-pork diet list affected him or his right to practice his religion. Accordingly, Sampson has failed to show that he holds a sincerely held religious belief that requires him to consume a no-pork diet. He also has failed to show how his removal from the no-pork diet substantially burdened the free exercise of his religion. *See Williams v. Mathena*, 2010 U.S. Dist. LEXIS 113273, at *9 (W.D. Va. Oct. 25, 2010) (finding that the inmate failed to establish that officials knowingly placed a substantial burden on his ability to practice his religious beliefs even where there was a several week delay in adjudicating a religious food request, as an accidental or negligent delay that impinges to some degree an inmate's religious practice does not state a constitutional claim). For these reasons, I will recommend that the court grant the motion and enter summary judgment in the defendants' favor on Sampson's claims related to his removal from the no-pork diet.

### PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Sampson has failed to state a claim upon which relief can be granted against Young;
2. The Medical Department of Middle River is not a recognized entity subject to suit; therefore, any claims against the Medical Department must be dismissed;
3. There is no genuine issue of material fact, and the court should enter summary judgment in the defendants' favor on any claims based on Sampson's injury to his ankle;
4. There is no genuine issue of material fact, and the court should enter summary judgment in the defendants' favor on any claims based on Sampson's medical treatment; and
5. There is no genuine issue of material fact, and the court should enter summary judgment in the defendants' favor on Sampson's claim related to his removal from the no-pork diet.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the Motion to Dismiss and the Motion for Summary Judgment.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo

determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: This 19th day of December, 2012.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE